## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| | : | |
| **CHARLES E. MOODY,** *et al* | : | |
| | : | **Case No. 1:07 CV 692** |
| **On behalf of themselves and on** | : | |
| **behalf of all others similarly situated,** | : | |
| | : | |
| **Plaintiffs,** | : | **Judge Beckwith** |
| **v.** | : | |
| | : | |
| **THE TURNER CORP.,** *et al.,* | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
## OF CLASS ACTION SETTLEMENT, CLASS CERTIFICATION, AND
## APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL

William H. Blessing (#0006848)
The Blessing Law Firm
119 East Court Street, Suite 500
Cincinnati, Ohio 45202
 (513) 621-9191

Eli Gottesdiener (*PHV*)
Gottesdiener Law Firm, PLLC
498 7th Street
Brooklyn, New York 11215
(718) 788-1500

*Counsel for Plaintiffs and the proposed Class*

**TABLE OF CONTENTS**

INTRODUCTION...................................................................................................1

FACTUAL BACKGROUND..................................................................................9

I.        Case History - History of Settlement Negotiations ..............................9

II.       The Settlement...........................................................................................14

          A.        The Total Settlement Amount and the Settlement Class ................14

          B.        The Net Settlement Benefit ...............................................................15

                    1.        Attorney's Fees and Expenses.................................................15

                    2.        Named Plaintiff Case Contribution Payments.....................15

                    3.        Notice and Plan Administration Costs...................................16

          C.        The Plan of Allocation ......................................................................16

          D.        Individual Settlement Benefits.........................................................17

III.      Proposed Notice to the Class – Releases of Liability from the Class...........................18

DISCUSSION........................................................................................................20

I.        The Proposed Settlement Meets the Standard for Preliminary Approval ................20

II.       The Proposed Class Should Be Conditionally Certified and the Named
          Plaintiffs and Plaintiffs' Counsel Appointed to Represent the Class........................22

          A.        The Proposed Classes Satisfy the Requirements of Rule 23(a)........................23

          B.        The Proposed Classes Satisfy Rule 23(b)(1)(A), (b)(1)(B)
                    and/or (b)(2)........................................................................................25

                    1.        The Requirements of Rule 23(b)(1)(A) Are Met ..................25

                    2.        The Requirements of Rule 23(b)(1)(B) Are Met ..................27

                    3.        The Requirements of Rule 23(b)(2) Are Met.........................28

          C.        The Court Should Appoint Undersigned Counsel as Class Counsel
                    Under Rule 23(g) ...............................................................................30

**III.    The Proposed Notice Satisfies Rule 23** ......................................................................**32**

      **A.    The Content of the Proposed Notice Satisfies Rule 23**.....................................**33**

      **B.    The Method of Disseminating Notice to Class Members
           Satisfies Rule 23**.................................................................................................. **34**

**CONCLUSION** ................................................................................................................**35**

**CERTIFICATE OF SERVICE** ......................................................................................**36**

**INTRODUCTION**

In October 2010, after over three years of hard-fought litigation and a year of off-and-on again negotiations using a private mediator, the parties to this ERISA pension benefits putative class action reached an agreement in principle to settle it.  Now, after months of additional negotiations over the concrete terms of the agreement and working with actuaries to ensure the completeness and accuracy of the participant benefit calculations data needed to implement it, the agreement has been fully memorialized and is ready for the Court to consider on this motion for preliminary approval.  *See* Ex. 1, Class Settlement Agreement ("Agreement").

Under the Agreement, Defendant The Employees' Cash Balance Retirement Plan of The Turner Corporation ("the Plan") will pay a total of $14.5 million (the "Total Settlement Amount") to settle the claims in this case that the Plan miscalculated the pre-retirement age lump sum pension benefits paid to some 2,484 former employees of Defendant The Turner Corporation ("Turner") between 1994 and August 17, 2006, the effective date of the Pension Protection Act of 2006 ("PPA"), which modified ERISA's defined benefit lump sum rules.  In addition to resolving these "whipsaw" (or "projection rate") claims, the proposed settlement also resolves Plaintiffs' related "crediting rate" claims.  Those claims alleged that Defendants credited participants' notional accounts, before distributing their balances to participants as lump sums, with annual (and later, quarterly) interest credits at the wrong interest crediting rate. Plaintiffs contended that Defendants should have applied the more favorable rate described in the Plan's summary plan description ("SPD") because it allegedly conflicted with the algorithm formula set forth in the master plan document and/or that in applying  the Plan's algorithm formula rate, Defendants misapplied the algorithm's terms.

Plaintiffs propose, and Defendants do not oppose, a "Plan of Allocation," *see* Ex. 1 at 8-9, under which the "Net Settlement Benefit" (the $14.5 million Total Settlement Amount minus Court-approved attorney's fees and expenses, named plaintiff case contribution payments, and notice costs, discussed below) would be divided based on an estimated 100% - 25% relative weighting of the value of the claims of two subgroups of proposed Class Members to account for their very different status vis-à-vis Defendants' statute of limitations defense:

- The claims of "Subgroup A," comprised of participants who received lump sums within six (6) years of the date suit was filed (August 21, 2007) and thus faced a low statute of limitations risk of non-recovery

  - as compared to -

- The claims of "Subgroup B," comprised of participants who received lump sums before August 21, 2001 and would recover nothing under this Court's rulings (unless reversed on appeal) that the applicable limitations period is 6 years and accrued the date participants received their lump sums.  *See* Order of November 23, 2009, Doc. 84 (granting Defendants' summary judgment on Mr. Tallentire's lump sum claim).[1]

After this proposed weighted division of the available settlement proceeds (which is subject to modification by the Court without impact to the validity or finality of the Agreement, *see* Ex. 1 at 11, § 2C), every proposed Class member's net payment (their "Individual Settlement Benefit," Ex. 1 at 6-7) would be determined in identical fashion:  in direct proportion to the harm they suffered, according to Plaintiffs' basic whipsaw damages theory under which participants' right to receive future interest credits through the normal retirement age (age 65 under the Plan) would be valued (or "projected") at no less than 7.5%, together with prejudgment interest from the date of receipt of the original, allegedly insufficient payment to December 1, 2010 (the

---

[1] *See also* Order of November 7, 2008, Doc. 38 (denying reconsideration of accrual ruling of Aug. 25, 2008); Order of February 22, 2010, Doc. 94 (denying reconsideration of applicable limitations period ruling and denying final order certification under Rule 54(b).

agreed approximate settlement date) using the IRC § 417(e) rate applicable to that original payment (which averaged around 5% during the applicable period).

According to Plaintiffs' actuarial experts, under the recommended Plan of Allocation, for Subgroup A members (*i.e.,* those proposed Class members not time-barred under the Court's limitations rulings), the settlement represents a gross recovery of over 70% of what they were underpaid under Plaintiffs' basic 7.5% whipsaw damages theory (together with prejudgment interest at the applicable § 417(e) rate).  *See* Declaration of Eli Gottesdiener ("Gottesdiener Decl.") ¶ 8.  Even after deducting the maximum possible fees and expenses under the Agreement – *i.e.,* the maximum possible award of attorney's fees under the Agreement, *see* Agreement at 4 (29% of the Total Settlement Amount or $4.205 million); the maximum possible award of expenses ($325,000), *id.*; the maximum possible named plaintiff compensation, *id.* at 7 ($3,000 per plaintiff); and the maximum estimated notice and administrative costs, *id.* ($80,000) – Subgroup A members would receive, on average, an additional $9,925 payment from the Plan, offered on the same tax-favored basis as their original payment was offered.  Gottesdiener Decl. ¶ 8.  This represents a net recovery for these participants of almost 50% of what they were underpaid under Plaintiffs' basic whipsaw damages theory together with prejudgment interest at the applicable 417(e) rate from the date of the original alleged underpayments until, effectively, today.  *Id.*

Subgroup B participants (*i.e.,* proposed Class members who are time-barred under the Court's limitations rulings) do not fare nearly as well as Subgroup A members under the proposed Plan of Allocation but that is as it should be.  Under the circumstances, weighting the relative value of Subgroups A's and B's claims on a 100%-25% basis is a reasonable if not scientific resolution of the two groups competing claims to the settlement proceeds.  According

3

to Plaintiffs' actuarial experts, Subgroup B members would receive a gross recovery of over 17%

of what they were underpaid under Plaintiffs' basic whipsaw damages theory plus interest.

Gottesdiener Decl. ¶ 9.  Even after deducting the maximum possible award of attorney's fees and

expenses, the maximum possible named plaintiff compensation, and the maximum estimated

administrative and notice costs, members of Subgroup B would receive, on average, an

additional $1,200 payment from the Plan, offered on the same tax-favored basis as their original

payment.  *Id.*  This represents for these participants a net recovery of 12%, of what they contend

they were underpaid under Plaintiffs' basic whipsaw damages theory plus interest.  *Id.*

As discussed below, Plaintiffs and undersigned counsel believe this is an excellent result.

This is a case in which Defendants had already succeeded (subject to appeal) in eliminating the

claims of over 65% of the members of the proposed Class via their statute of limitations defense.

Gottesdiener Decl. ¶ 9.  This is also a case in which Defendants also had the substantial

possibility of prevailing on their contention that the remaining Class members' whipsaw

damages were $0 or, if not $0, a lot less than $14.5 million.  Damages would be $0 for the non-

time-barred participants either if the projection rate the Court selected to perform the required

whipsaw calculation used:  (1) the rate in effect on the date the participant elected to receive his

or her lump sum (4.5% throughout the years applicable to Subgroup A members, *see* Factual

Background, ¶ 4 below) or (2) an average of up-to-the-5-prior years-projection methodology,

required under the Treasury Department's cash balance plan "safe harbor" nondiscrimination

regulations.

Method (1) – *i.e.,* the "then-current rate" method – was used in *Berger v. Xerox Ret.*

*Income Guar. Plan,* 231 F.Supp.2d 804, 818 (S.D.Ill.2002) and *Lyons v. Georgia-Pacific Corp.*

*Salaried Employees Retirement Plan,* 196 F.Supp.2d 1260, 1265-67 (N.D.Ga.2002).  It would

result in $0 damages because in each of the years in question, when the Plan's interest crediting rate was 4.5%, the applicable *discount* rate was higher, *see* Factual Background, ¶¶ 4-5 below, meaning payment of a lump sum equal to the participant's notional account balance would have not been an underpayment.

Method (2) – *i.e.,* use of an up-to-5 year average of prior years rates, based on the Treasury Department's nondiscrimination regulations for safe harbor cash balance plans – is a method that this Court has already noted "may be a reasonable approach," Order of August 6, 2008, Doc. 25 at 14 (denying Defendants' motions to dismiss), but also would lead to $0 damages (because an average of several years of a 4.5% return is still 4.5%).  Plaintiffs were right to take seriously the possibility that if the litigation continued they would end up with no more than they had already received via the Court's adoption of this method.  Indeed, in a case involving a somewhat similar interest crediting rate in remanding to the district court for an independent determination of an appropriate rate, the Seventh Circuit recently agreed that use of a 5-year average of prior years' interest credits rates seems like a reasonable approach, and noted "the [referenced] regulations and several precedents support the use of such an average."  *See Thompson v. Retirement Plan for Employees of S.C. Johnson & Son, Inc.,* Nos. 10–3917-18, 3988-89, 2011 WL 2463550, *9 n.17 (7th Cir. June 22, 2011).[2]  For members of Subgroup A, if this Court did indeed find, on summary judgment or at trial, the up-to-5-year averaging approach reasonable, they would recover nothing.

---

[2] These comments were made in the context of reversing district court's decision to defer to the plan's suggested replacement projection rate. *Id.* at *6-9.  Note that *Thompson* also affirmed the district court's statute of limitations rulings in effect parallel those this Court made here:  the Court of Appeals held that the claims of participants receiving lump sums within 6 years of the date suit was filed are timely but the claims of participants receiving lump sums more than 6 years before the date suit was filed are time-barred.  *Id.* at *3-6.

But even if Plaintiffs could overcome Defendants' no-damages defenses, Plaintiffs had to be concerned that they may still have been handed a Pyrrhic victory if the Court set the projection rate substantially below than the 7.5% projection rate, the rate upon which net settlement benefits under the Agreement will be based and/or if the Court exercised its discretion not to award prejudgment interest or use the post-judgment, 28 U.S.C. § 1961 rate, which is substantially lower than participants will receive under the Agreement.

In sum, a $14.5 million settlement, taking into account all of the circumstances, is a very favorable result by almost any measure.  Now, instead of the lengthy, costly, and uncertain course of further litigation, the settlement provides a significant and expeditious route to certain recovery for all members of the proposed Class.

The proposed settlement is no less of an excellent outcome because it also resolves Plaintiffs' crediting rate claims and not merely Plaintiffs' whipsaw claims.  Frankly, the viability of the SPD-Plan conflict crediting claims was already tenuous, as Defendants had long-argued, *see, e.g.,* Defs. Opp. to Pls. Mtn. for Class Cert. (Doc. 106) at 18-25, but under the Supreme Court's recent decision in *Cigna Corp. v. Amara,* 131 S.Ct. 1866 (2011), which reversed a decision enforcing SPD terms that conflicted with less favorable plan terms, it is hard to envision those claims now surviving a motion to dismiss.  By contrast, Plaintiffs had a solid alternative crediting rate theory that Plaintiffs and their experts discovered as more internal documents were produced based on Defendants' alleged misapplication of the Plan's algorithm, as Plaintiffs detail at length in both their proposed Third Amended Complaint and their motion and reply brief in support of their motion for leave to file that complaint.  *See* Proposed Third Amended Complaint (Doc. 121-1), Sec. IV, ¶¶ 94-117; Pls. Mtn. for Leave to File TAC (Doc. 121); Pls. Reply in Support of Mtn for Leave to File TAC (Doc. 133).  But assuming the Court permitted

6

the amendment (which Defendants opposed, *see* Defs. Opp. (Doc. 128)), the problem became not

so much proving that Defendants misapplied the multiple moving parts algorithm (although that

would have been an exceedingly complex undertaking, including making its intricacies

accessible enough so that Plaintiffs could convincingly persuade the Court that the way

Defendants administered of the formula was not a permissible interpretation of ambiguous

formula terms entitled to deference but rather impermissible alternations, in violation of the

terms of the Plan).  The real problem was establishing that the algorithm, correctly applied

(according to Plaintiffs), would have netted participants rates much higher than those Defendants

actually credited, especially if the period for which Plaintiffs' recovery was possible was limited

due to the operation of the statute of limitations.  *See* Gottesdiener Decl. ¶ 10.

Thus, the Court should preliminarily find the Agreement is fair, reasonable and adequate

and grant the proposed settlement preliminary approval because it is within the range of possible

approval.  Fed. R. Civ. P. 23(e).  Such conditional approval will permit notice of the terms of the

proposed settlement to be sent to the proposed Class, certification of which under Rule 23 is also

sought via this motion for settlement purposes only.  As explained below, certification should be

granted because all of the requirements of Rule 23(a) and (b) are satisfied here and indeed this

case is ideally suited for class treatment under Rule 23.[3]  The Court should also approve the

proposed mailed notice and publication notice to the Class (attached as Exhibits B and C,

respectively, to Ex. 1, the Settlement Agreement), in terms of both their content and their manner

of dissemination, because they satisfy the requirements of Rule 23 and due process.  Defendants

---

[3] Of course, class certification can only be granted if the Rule 23's prerequisites are established even when certification is sought for settlement purposes only.  *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 620 (1997).

have authorized Plaintiffs to represent that they concur in the relief sought by this motion.  *See* Gottesdiener Decl. ¶ 1.

        To provide sufficient time for notice and objections, Plaintiffs respectfully request that the fairness hearing be scheduled not less than ninety days (90) days after entry of the proposed Preliminary Approval Order (Ex. D to the Agreement), or at the Court's convenience.[4]  The parties have agreed to the following schedule of events, the actual dates of which will be determined after the Court sets a fairness hearing date but which are shown below with dates supplied assuming that preliminary approval is granted by July 15, 2011, and that a fairness hearing date of October 17, 2011 is set:

| Event | Days following Preliminary Approval or Preceding Final Approval Hearing | Proposed Dates Assuming Preliminary Approval By 7/15/11 and Final Hearing on 10/17/11 |
| --- | --- | --- |
| Defendants send CAFA Notices | Within 10 days of the filing of the Motion for Preliminary Approval | July 15, 2011 |
| Defendants send Participant List to Notice Administrator | Within 5 business days of Entry of Preliminary Approval Order | July 22, 2011 |
| Administrator mails Notice to Class Members | To be completed within 30 days of Entry of Preliminary Approval Order | August 14, 2011 |
| Publication Notice Published | To be published no later than within 30 days of Preliminary Approval Order | August 14, 2011 |
| Petition for Class Counsel Fees and Named Plaintiffs' Compensation | No later than 28 days prior to Final Approval Hearing | September 19, 2011 |
| Publish fee petition to website | Within 3 business days of Fee Petition filing | September 22, 2011 |
| Class Member Objections to be postmarked | No later than 14 days prior to Final Approval Hearing | October 3, 2011 |

---

[4] An electronic copy of the proposed Preliminary Approval Order in Word format, suitable for use if the Court grants the instant motion, is being electronically mailed to the Court's Case Manager pursuant to Section II(E)(2)(d) of the Court's CM/ECF Policy and Procedure Manual simultaneously with the filing of the instant motion.

| Rollover request deadline | No later than 5 business days prior to Final Approval Hearing | October 10, 2011 |
|---|---|---|
| Motion for Final Approval | No later than 7 days prior to Final Approval Hearing | October 10, 2011 |
| Administrator files proof of mailing and publication | No later than 7 days prior to Final Approval Hearing | October 10, 2011 |
| Final Approval Hearing | NA | October 17, 2011 |

## FACTUAL BACKGROUND

**I.      Case History - History of Settlement Negotiations.**

1.      This case, filed in August 2007, principally involves Plaintiffs' claims that the

Plan, a "cash balance" defined benefit pension plan, failed to calculate the lump sum pension

benefits it paid to pre-retirement age participants requesting their Plan benefit in that form in

accordance with ERISA's minimum lump sum distribution requirements, as interpreted by this

Court and, subsequently, the Sixth Circuit in *West v. AK Steel Corp. Ret. Accum. Pension Plan,*

484 F.3d 395 (6th Cir. 2007).

2.      The key difference between this case and *AK Steel* – in essence, what prevented a

resolution of the dispute before now – is the sheer complexity of the Turner Plan's one-of-a-kind

algorithm-based interest crediting rate and the determination of what rate should have be applied

to participants' account balances between the date they requested a lump sum and the date they

attained normal retirement age under the plan (here and in *AK Steel,* as in most plans, age 65) –

*i.e.,* what the correct "projection rate" needed to be to ensure that participants were not "sell[ing]

their pension entitlement back to the company cheap."  *Berger v. Xerox Corp. Retirement

Income Guarantee Plan*, 338 F.3d 755, 762 (7th Cir. 2003).

3.      In *AK Steel,* the rate to use for projecting participants' account balances to age 65

before discounting them to a present value using the statutorily-mandated interest rate was a

relatively straightforward question.  Here, how to value future interest credits was anything but

simple.  As the Court will recall, the Turner Plan's interest crediting rate or "Earnings Credit" was defined as "a guaranteed minimum rate of 4.5% per annum plus, if applicable, a supplemental rate" and that the supplemental rate was determined by "a complicated formula" set forth in appendices to the plan document.  *See* Order of August 6, 2008, Doc. 25 at 14 (denying Defendants' motions to dismiss, explaining further that "[t]his very complex formula apparently computes a rate of return for a hypothetical basket of holdings reflecting 65% S&P 500 index and 35% Lehman intermediate bond index, plus factoring in the yearly inflation rate. This rate is then compared to the cash balance accounts (and perhaps other factors), to compute if a supplemental rate applies in any given year").[5]

4.    This algorithm-based rate has produced very different results over the years between 1994, the first year of the Plan's operation, and today.  In 1994, there was no supplemental rate.  But between 1995 and 1999, each year the combined minimum and supplemental rates were in the double-digits.  But then since 2000, the Plan's Earnings Credit has been 4.5%, *i.e.*, there has been no supplemental credit.[6]

5.    In January 2008, emphasizing the long string of 4.5% years and the amount of time that had passed since many proposed Class members had received their lump sums, the Plan moved to dismiss Plaintiffs' First Amended Complaint (Doc. 13), filed November 13, 2007,

_____

[5] More specifically, the formula or algorithm employed three hypothetical accounts to determine whether and to what extent a supplemental rate should be paid in a given Plan year:  (1) the "Market Value Account" ("MVA") which increased or decreased each year based on the return on a hypothetical asset mix of 65% of the S&P 500 and 35% of the Lehman Bros. (now Barclay's) Intermediate Government/Corporate Bond Index; (2) the "Stabilized Notional Account" ("SNA"); and (3) the year-end aggregate of participants' Cash Balance Accounts assuming that the minimum guaranteed 4.5% earnings credit applied during the year ("ICBA").  *See* 1994 and 2002 Plans, Appendix A1.  If at year-end, both the MVA and SNA were greater than the ICBA, then a supplemental rate is payable, with the aggregate supplemental amount determined by taking the lesser of the MVA and SNA, and subtracting the ICBA. *See* 1994 and 2002 Plans, Appendix A2.

[6] The Plan was frozen effective December 31, 2003 and in the wake of the issuance of new regulations under the Pension Protection Act, amended to replace eliminate the algorithm rate with a less complex and arguably less valuable rate.  *See* Proposed Third Amended Complaint (Doc. 121-1) ¶ 84.

arguing that Plaintiff Tallentire's whipsaw claim was time-barred and that Plaintiff Moody, who received his lump sum in 2005 when the rate was 4.5% and the applicable 417(e) rate was higher than 4.5%, had no damages.  Defendants argued that whether the Court projected future interest credits using the rate in the year Mr. Moody took his benefit or whether it used an average of the crediting rates up-to-5 years prior to the date of distribution (per the referenced Treasury regulation), Mr. Moody received *more* than the actuarial equivalent of his age 65 accrued benefit when the Plan paid him his notional account balance because in either case the applicable discount rate exceeded the assumed projection rate, rather than *vice versa* as is the case anytime a participant is entitled to a whipsaw benefit, *i.e.,* a payment exceeding his or her notional account balance.  *See* Docs. 17, 20.

6.    In August 2008, the Court denied the Plan's motion as to Mr. Moody, finding that "[w]hile the regulation concerning non-discrimination testing may be a reasonable approach [to the projection rate question], the Court cannot conclude that it is the **only,** much less the **required** method to apply, notwithstanding the apparently contrary statement in *Berger*."  Doc. 25 at 14 (emphasis in the original).  The Court further explained its decision by saying:

> The Plan's defined credit rate is not tied to a (relatively) stable Treasury rate, but is a complicated formula that takes into account the market values of equities and bonds, as well as annual inflation rates. The Plan protests that this Court cannot simply "invent" a credit rate.  The Court has no intention of doing so; rather, the task before the Court is to determine if the Plan's argument - that use of the rate in effect in the year of Moody's distribution – results in a lump sum payment that is the "actuarial equivalent" of the accrued benefit at retirement age.

*Id.*

7.    Regarding Defendants' limitations defense, the Court found Mr. Tallentire's whipsaw claim was not time-barred based on the assumption that the 15-year Ohio statute of limitations period for written contract claims applied but determined that the applicable

11

limitations period began to accrue no later than the date he received his lump sum, *i.e.,* in May 1995.  *Id.* at 25-26.  Although the Court rejected the Plan's argument that the four-year rule of 28 U.S.C. §1658 applied to Mr. Tallentire's claim, it left open the possibility that the Plan could establish that a borrowed limitations period other than the 15-year Ohio contract actions period applied.  *Id.* at 24-25.  Defendants later convinced the Court that, under *Redmon v. Sud-Chemie*, 547 F.3d 531 (6th Cir. 2008), the correct applicable limitations period is R.C. § 2305.07, the Ohio provision supplying a 6-year limitations period for actions based on a liability created by statute such that Mr. Tallentire's claim, and the claims of all participants receiving lump sums prior to August 21, 2007 – who comprise more 65% of the members of the proposed Class, *see* Gottesdiener Decl. ¶ 9 – are time-barred.  *See* Order of November 23, 2009, Doc. 84.  *See also* Order of February 22, 2010, Doc. 94 (denying reconsideration and denying final order certification under Rule 54(b)).

   8. The parties spent the two years following the Court's August 2008 rulings engaging in often highly-contentious motions practice, and merits and class certification-related discovery.  When they reached their agreement in principle to settle in October 2010, they were two and a half months from the (twice-extended) discovery cut-off, *see* Docs. 82, 109, Plaintiffs were about to depose the key fact witnesses in the case, and Plaintiffs' actuarial and economic finance experts were less than two weeks away from finalizing their expert reports.  Gottesdiener Decl. ¶ 7.  By that time, Plaintiffs had received and analyzed well over 10,000 distinct electronically stored information ("ESI") and hard-copy documents, numbering well over 100,000 pages, having served several rounds of document requests and interrogatories on Defendants; having subpoenaed the Plan's two actuaries (Buck Consultants, LLC and Mercer); Turner's two actuarial consultant (The Segal Company and Altman & Cronin Benefits

Consultants, LLC); the Plan's investment consultants (Ennis Knupp & Associates and Rowland

Davis); and the Plan's auditor (Ernst & Young); and having filed two motions to compel against

Defendants (both partially successful), *see* Orders of September 30, 2009 and May 10, 2009,

Docs. 75, 101, and two motions to compel compliance with their subpoenas (filed in other

districts, both of which were also partially successful). Gottesdiener Decl. ¶ 7. Additionally,

Defendants had deposed Plaintiffs and the parties had also fully briefed Plaintiffs' motion for

class certification, *see* Docs. 99, 106, 117, and the parties had also fully briefed Plaintiffs'

motion for leave to file a third amended complaint. *See* Docs. 121, 128, 133. In sum, by

October 2010, when Plaintiffs reached the decision to settle on the terms embodied in the

Agreement, Plaintiffs and their experts had thoroughly (indeed, exhaustively) investigated and

evaluated their claims and Defendants' available defenses and the risks attendant to further

litigation. Gottesdiener Decl. ¶ 4.

        9.     The negotiations leading to the settlement took a full year and were arm's-length.

*Id.* ¶ 5. In April 2010, Plaintiffs turned down a settlement offer of $5.86 million and in June

2010, after the parties hired a professional mediator with expertise in large class action mediation

(Michael D. Young, Esq. of JAMS), rejected another, better opportunity to settle – this time at

closer to $10 million – in favor of continued litigation. *Id.* Settlement talks were then

discontinued but resumed in October 2010 when (Plaintiffs believe, based on additional

favorable evidence coming to light) a break-through was finally achieved and the agreement in

principle was reached. *Id.* But it then took months of additional negotiations over the concrete

terms of the agreement and working with actuaries to ensure the completeness and accuracy of

the participant benefit calculations data needed to implement it before it could be finally

memorialized. *Id.*

## II.      The Settlement

### A.      The Total Settlement Amount and the Settlement Class.

As outlined above, the Settlement Agreement provides for a total payment – a "Total Settlement Amount" – of $14.5 million by the Plan.  *See* Ex. 1 at 10.  The Net Settlement Benefit – the Total Settlement Benefit less Court-authorized deductions – would be distributed to the members of the following non-opt-out Class, which the Agreement contemplates the Court would conditionally certify for settlement purposes only under Fed. R. Civ. P. 23(b)(1)(A), 23(b)(1)(B), and/or 23(b)(2), consisting of:

(i)      All persons identified on the Participant List as having received a lump sum distribution from the Plan at any time between January 1, 1994 and August 17, 2006, prior to reaching age 65 ("Listed Participants"); together with

(ii)     The beneficiaries and estates of such persons and alternate payees under a Qualified Domestic Relations Order ("Listed Participant Successors")

Ex. 1 at 4.

The Participant List referenced in the Class definition is comprised of all persons known to the parties who would be entitled to a "Whipsaw Amount," *i.e.,* any monetary recovery under Plaintiffs' basic whipsaw damages theory referenced above and detailed in the Agreement.  *Id.* at 8, 10.  Defendants represent to Plaintiffs and the Court that they have used best efforts to make sure that the Participant List is accurate and complete.  *Id.* at 15, § 7I.  However, because of the possibility that some claimants may have been inadvertently left off the Participant List, the Agreement provides that any such person is not subject to the Agreement and does not waive any rights or claims he or she may have with respect to the sufficiency or correctness of any lump sum from the Plan.  *Id.*  Moreover, the Agreement specifies that nothing prevents Class Counsel from representing such persons in bringing a claim against the Plan in the future should such persons, if they exist, seek his representation for that purpose.  *Id.*

14

**B.      The Net Settlement Benefit**

The Net Settlement Benefit available for payment to the Class is defined as the Total

Settlement Amount ($14.5 million) less (1) whatever amount the Court approves as attorney's

fees and expenses; (2) whatever amount of named plaintiffs' case contribution payment the

Court approves if any; and (3) certain defined notice costs, discussed below.  *Id.* at 7.

**1.      Attorney's Fees and Expenses.**  Counsel will seek an award of attorney's

fees of 29% of the Total Settlement Award ($4.205 million), plus costs and expenses not to

exceed $325,000, inclusive of a reasonable estimated fees and expenses for the future work that

will be necessary to oversee and monitor implementation of the settlement and distribution of its

proceeds .  *Id.* at 4.  To ensure that Class members have an adequate opportunity to review and

make objections to the request, counsel will file his fee petition at least twenty eight (28) days

prior to the final approval hearing, *id.,* Ex. A, proposed Preliminary Approval Order ¶ 7 at 5, and

promptly post it on the internet website dedicated to the proposed settlement

(www.moodypensionclassaction.com), which would be activated upon the Court's grant of

preliminary approval.[7]  Both the proposed mailed notice to the Class and the publication notice

will also apprise proposed Class members of counsel's potential fee request and direct Class

members to the website for a copy of the fee petition, the Agreement and other information about

the proposed settlement.  Ex. B, proposed Mailed Notice, Section VII; Ex. C, proposed

Publication Notice.

**2.      Named Plaintiff Case Contribution Payments.**  The named plaintiffs

will petition the Court for an award of no more than $3,000 each for services rendered to the

---

[7] The fee petition will provide all information necessary for performance of a lodestar cross-check and
will itemize all case-related expenses in accordance with the required standards.

Class at the same time counsel files the fee petition.  *Id.* at 7.[8]

> **3.**  **Notice and Plan Administration Costs.**  The maximum estimated cost

of mailed notice and publication notice to the Class is $80,000.  *Id.* at 8.  These costs are the

responsibility of the proposed Class under the Agreement.  *Id.*  However, the Plan has agreed to

shoulder the costs that will be incurred in making the required payments, including processing of

Class members' election forms or default elections as the case may be and the cost of distributing

settlement checks and implementing rollover requests.  *Id.* at 8.

> **C.**  **The Plan of Allocation.**

As outlined above, the proposed Plan of Allocation divides the Net Settlement Benefit on

a 100%-25% weighted basis between Subgroup A and Subgroup B.[9]  Because Defendants were

unwilling to negotiate a partial settlement of claims, *see* Gottesdiener Decl. ¶ 5, it was and is

necessary to assign a relative value to the claim held by a participant who could be time-barred

altogether as compared to an otherwise identical claim held by a participant who faces barriers to

recovery or full recovery but no such risk of time-bar.  The 100%-25% weighting is counsel's

non-scientific but well-informed and well-considered assessment of the relative value of the

respective Subgroup members' claims weighing the risk that Defendants' statute of limitations

---

[8] Plaintiff David Creps, who did not receive a lump sum and asserted crediting rate claims only, *see* Order of May 12, 2009, Doc. 54 (denying Defendants' motion to strike), has entered into a separate agreement with Defendants that settles all his claims and is not subject to Rule 23 because he is not part of the proposed settlement class, it does not implicate any member of the proposed Class nor seek to compromise the rights of any person other than himself.  Gottesdiener Decl. ¶ 5 n.5.

[9] While the Agreement uses the term "Subgroup," it does so solely for purposes of the proposed Plan of Allocation, and not in any formal Rule 23 sense.  Plaintiffs are not requesting certification of these two Plan of Allocation Subgroups under Rule 23.  As noted, between preliminary and final approval, the Court will be free to modify the Plan of Allocation without impact to the Agreement's validity, Ex. 1 at 11, § 2C, and proposed Class members will be free to suggest such modification.  Any conflict between the two subgroups over the recommended allocation plan can be resolved by the Court's exercise of its informed discretion as to what is a fair and equitable division of the net settlement proceeds, with such modification, if any, to be made upon final approval.

defense as to Subgroup B could not be overcome based on newly-discovered evidence or on appeal.  Gottesdiener Decl. ¶ 6.  Mr. Moody and Mr. Tallentire, who were both deposed and fully engaged in the mediation and negotiation process, agree that the 100%-25% weighting is a fair, reasonable and adequate division of the Net Settlement Benefit under the circumstances.  *Id.*

However, the Court, not Plaintiffs or their counsel, has the final say as to the Plan of Allocation because the parties remain bound by the Agreement even if the Court were to order a different division of the proceeds upon a more complete record.  Ex. 1 at 11, § 2C.  For now, the Court need only conclude that the Plan of Allocation is within the range of reasonableness based on the foregoing considerations and thus that the proposed settlement and proposed plan of allocation should be presented to the proposed Class for Class Members' objections or comment.  Even if the Court thinks it may ultimately order a different allocation of the Net Settlement Benefit, notifying the proposed Class and seeking their reactions and input would still be appropriate now.

### D.    Individual Settlement Benefits.

However the basic net settlement proceeds are divided, the amount of each Class Member's Individual Settlement Benefit will be calculated by multiplying the Net Settlement Benefit applicable to the Class Member's Subgroup by the ratio that the Class Member's alleged underpayment bears to the total underpayments made to the applicable Subgroup.  *Id.* at 6-7.  Thus, the distribution of the net benefit of the settlement would be *pro rata*, in strict proportion to the Class Member's actual loss according to Plaintiffs' basic whipsaw damages theory as described above and in the Agreement, as calculated by the enrolled actuary Plaintiffs will engage for that purpose.[10]

---

[10] The 3-step calculation that will be used to arrive at each participant's individual settlement benefit proceeds as follows:  (1) determine each proposed Class member's "Whipsaw Amount" by taking the

17

Each Class Member's Individual Settlement Benefit would be paid, to the greatest extent possible, from the Plan as a tax-qualified Settlement Benefit.  *Id.* at 16, § 8D.  If all or a portion of a Class Member's Settlement Benefit cannot be paid from the Plan as a tax-qualified Settlement Benefit, the Plan or the Firm will arrange to pay the amount as a non-qualified Settlement Benefit.  *Id.*[11]

Class Members will have the option of electing to roll the payment over or receive a direct distribution, net of the Plan's withholding for federal income taxes.  *Id.* at 16, § 8E(i)-(ii). If they do not make a timely election between a rollover and a direct distribution, they will receive a direct distribution, net of the Plan's withholding for federal income taxes.  *Id.* at 17, § 8E(iii).

## III.  Proposed Notice to the Class – Releases of Liability from the Class.

The parties have agreed on the form and content of both mailed individualized notice ("Mailed Notice") and a general publication notice ("Publication Notice"), attached as Exhibits B and C to the Settlement Agreement, in order to adequately inform all known Class members of their rights under the terms of the Settlement.

The Mailed Notice explains the case history; the settlement reached; the proposed plan of allocation and reasons why Plaintiffs believe it is fair and reasonable under the circumstances; and the procedure for obtaining final approval and procedures for objecting to or commenting on

---

amount that each proposed Class member was individually underpaid according to Plaintiffs' basic damages theory together with prejudgment interest at the § 417(e) rate from the date they received their original payment to December 1, 2010; (2) determine what percentage or ratio the individual Class member's alleged underpayment (plus interest, on the terms set forth above) bears to the aggregate of alleged underpayments (plus interest) within that member's respective Subgroup; and (3) arrive at the dollar amount of each proposed Class member's net additional individual pension benefit to be distributed by the Plan upon final approval by multiplying the member's ratio by his or her Subgroup's Net Settlement Benefit.  *Id.*

[11] Because the Plan is a tax-qualified entity under the Internal Revenue Code, it is limited in the amount and type of benefits that it can distribute as tax-qualified benefits.  *See* IRC § 415.

the proposed settlement and/or the requested attorney's fee and named plaintiff case contribution payments once they are submitted. *See* Ex. B.

Each Mail Notice is personal to the recipient and contains a specific estimate of the individual Class Member's Settlement Benefit calculated by the enrolled actuary referenced above, and based on the assumption that the Plan of Allocation is approved with the Court awarding the maximum attorney's fee, expense award, named plaintiff compensation that can be requested and expending the maximum estimated cost of administration and mailed notice. *Id.* The notice informs Proposed Class members that should these deductions be less than maximum, their net benefit would be proportionately higher than estimated. *Id.*

The Publication Notice will be published in *USA Today* and will also discusses the case history, the proposed Settlement, the procedure for obtaining final approval and procedures for objecting to or commenting on the Settlement and/or the Class Counsel's and Named Plaintiffs' case contribution payments once they are submitted. Ex. C. It also advises persons who believe they are members of the Class but have not received an individualized Mailed Notice to contact Class Counsel immediately. *Id.*

In return for the payment and benefits described above, Plaintiffs and the Class will seek entry of a Final Order and Judgment in accordance with the terms of the Agreement dismissing with prejudice all claims in the Lawsuit and releasing Defendants Ex. 1 at 13-15, § 7. As described in the Notice, in addition, after final approval, each member of the Class will be deemed to have released the Plan from any and all claims except for individual claims outside the scope of the Complaint or Amended Complaint (such as a claim that the Class Member's original lump sum was incorrectly calculated by reason of one or more factual errors), provided the participant gives Defendants written notice of such claim no later than the deadline

19

established in the Preliminary Order for objecting to the Settlement.  *Id.* & *id.* at 9-10.  The

Mailed Notice in particular fully apprises proposed Class members of the effect the final

approval of the proposed settlement will have on their rights in all these regards.  *Id.,* Ex. B,

Section IV.

**DISCUSSION**

**I.    The Proposed Settlement Meets the Standard for Preliminary Approval**

Rule 23(e) provides that "[t]he claims, issues or defenses of a certified class may be

settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P.

23(e).  The procedure for approving a class action settlement consists of two steps: (1) a

preliminary fairness evaluation; and (2) a final approval order issued after notice of the

settlement is disseminated and a hearing to consider the fairness of the proposed settlement has

been held.  *See, e.g.*, *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983). While final

approval of a class action settlement requires a specific finding that the settlement is "fair,

reasonable and adequate," at this juncture this Court need determine only that the proposed

settlement falls "within the range of possible approval."  *Manual for Complex Litigation,* §

30.41, at 236-37 (3rd ed.1995).  A more thorough examination of the settlement should be made

based upon the record presented for final approval.  *Id.*

The proposed settlement is substantively and procedurally fair for present purposes and is

a viable candidate for final approval.  The proposed settlement would provide Class members

with substantial relief without further delay.  All Class Members face risks of non-recovery or

significantly reduced recovery compared to what they would receive under the proposed

settlement.  Given the complexities of this action; the skill and tenacity of defense counsel; the

no-damages, statute of limitations and other defenses available to Defendants that could

20

eliminate or greatly reduce the Class's recovery; and the risk of increased costs that would offset

the recovery and continued delays in receiving a benefit from the litigation if the parties were to

proceed to summary judgment and/or trial and through a possible appeal, the proposed settlement

represents a reasonable resolution of the Class's claims.  It completely eliminates the risk that the

proposed Class or some portion of the proposed Class might not otherwise recover from

Defendants, or might not recover nearly as much as it would under the proposed settlement.

      The Court can give weight to the opinion of experienced and non-collusive counsel in

determining whether to preliminarily approve a settlement.  Indeed, the Sixth Circuit has held

that, in the context of approving class action settlements, the Court "should defer to the judgment

of experienced counsel who has competently evaluated the strength of his proofs." *Williams,* 720

F.2d at 922-23; *accord Bert v. AK Steel Corp.*, No. 1:02-CV-467, 2008 WL 4693747, *3 (S.D.

Ohio 2008) (giving considerable weight to opinion of "experienced class action litigators").  As

this motion attests, undersigned counsel, whose ERISA and class action experience are detailed

below, considers the proposed settlement an excellent result in light of the defenses and

alternative damages theories available to Defendants.[12]  Moreover, the involvement of a

professional mediator in helping broker the proposed settlement should give the Court added

confidence that the proposed settlement was indeed the result of arm's length negotiations.  *See,*

*e.g., Hainey v. Parrott*, 617 F.Supp.2d 668, 673 (S.D. Ohio 2007) ("The participation of an

independent mediator in settlement negotiations virtually insures that the negotiations were

conducted at arm's length and without collusion between the parties").

---

[12] Defense counsel, highly experienced in ERISA pension class actions, also believe that the proposed
settlement is fair, reasonable and adequate.  *See* Ex. 1 at 3, Recital 10.

**II.    The Proposed Class Should Be Conditionally Certified and the Named Plaintiffs and Plaintiffs' Counsel Appointed to Represent the Class.**

ERISA pension benefit cases such as this one are regularly certified as class actions and are ideally suited for treatment under Rule 23 when, as here, the named plaintiffs bring the same claims raising issues common to all members of the proposed classes having nothing to do with the individual characteristics of the Plan participants or proposed class members affected by the challenged conduct, the factual underpinnings and legal theories plaintiffs advance apply to each member of the proposed classes, and the relief plaintiffs personally seek is no different than the relief they seek on behalf of the respective proposed classes. *See, e.g., Pender v. Bank of America Corp.*, 269 F.R.D. 589 (W.D.N.C. 2010) (certifying cash balance plan case and non-opt-out classes); *Thompson v. Retirement Plan for Employees of S.C. Johnson & Sons, Inc.*, 265 F.R.D. 405 (E.D. Wis. 2010) (same); *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 255 F.R.D. 628 (W.D. Wis. 2009) (same).  This case is tailor-made for treatment under Rule 23.

To maintain a class action, Plaintiffs must satisfy the four requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy of representation) and demonstrate that the case is "maintainable" under any one of the three prongs of Rule 23(b):  Rule 23(b)(1) ((A) or (B)), (b)(2) or (b)(3).  *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998).  Here, all the requirements of Rule 23(a) are met, and the case may be maintained as a "mandatory" class action under Rule 23(b)(1) and/or (b)(2), which are preferred for their relative ease of administration and superior *res judicata* effects over Rule 23(b)(3), which provides for automatic notice and the right to opt-out.  *See Robertson v. Nat'l Basketball Assoc.,* 556 F.2d 682, 687 (2d Cir. 1977) (court should certify a proposed class under (b)(1) instead of (b)(3) if possible).

A.      **The Proposed Classes Satisfy the Requirements of Rule 23(a).**

The first Rule 23(a) factor ("numerosity") requires the court to find that the proposed class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1). The numerosity requirement does not impose an absolute numerical limitation.  *See General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Rather, the Court must examine the facts of the case and determine whether Plaintiffs will suffer distinct litigational hardship or inconvenience if joinder is required.  *See, e.g., West v. AK Steel Corp. Retirement Accumulation Pension Plan*, No. 102CV00001 (S.D. Ohio, Mar. 9, 2004), Doc. 55 (slip op.) at 5.

This requirement is met here.  The proposed Class consists of some 2,484 members.  *See* Gottesdiener Decl. ¶ 9.  This is sufficient to satisfy numerosity.  *West*, slip op. at 5 ("Clearly, a class of this size [approximately 700] satisfies the numerosity requirement").

The second Rule 23(a) factor ("commonality") requires a finding that there are questions of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2).  This requirement is satisfied if the resolution of at least one common issue will affect the class as a whole.  *See Fallick v. Nationwide Mut. Ins. Co.,* 162 F.3d 410, 424 (6th Cir.1998). A "perfect fit" of all issues is not required.  Rather, the commonality required by Rule 23(a)(2) is "qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." *In re American Med. Systems,* 75 F.3d 1069, 1080 (6th Cir.1996). The common issue identified should advance the litigation if resolved.  *Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir.1998).  The fact that issues peculiar to individual class members may remain after the determination of the common question does not necessarily defeat certification.  *See Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988).

Here, common to all members of the Class is the issue of whether their lump sums should have been calculated using a projection rate greater than the applicable 417(e) discount rate. This is enough to satisfy the commonality requirement.  *See, e.g.*, *Esden v. Ret. Plan of the First Nat'l Bank of Boston*, 182 F.R.D. 432, 441 (D.Vt. 1998), *aff'd*, 229 F.2d 154 (2d Cir. 2000) (certifying class; correct methodology for calculating the lump sum presents a common issue).

The third Rule 23(a)(3) factor ("typicality") requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). Here, this test is met in the case of the proposed Class because Plaintiffs do not assert any claims in addition to or different than those of the proposed Class, nor are any of the defenses asserted against them different than those asserted against the members of the proposed Class they seek to represent.  *See West,* slip op. at 7 ("Liability in this case will depend entirely on whether or not Defendants were required to engage in a whipsaw calculation when determining the amount of Plaintiff West's and the other class members' lump-sum disbursements. Except for the calculation of damages, facts specific to individual class members will not be relevant to resolving the claims of Plaintiff West and the other class members. Because the claims asserted by Plaintiff West and the class are not fact specific, Plaintiff West's claims and defenses are the same as those of the other class members").  Here, the claims of the Plaintiffs are identical to those of the proposed Class members they seek to represent:  Defendants' uniform application of the disputed projection rate methodology is what gives rise to everyone's claims.

The final Rule 23(a) factor ("adequacy") requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Two criteria for determining the adequacy of representation are generally recognized: "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the

24

representatives will vigorously prosecute the interests of the class through qualified counsel."

*Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976).  This test is met here because

1) the interests of Plaintiffs and undersigned counsel are perfectly aligned with those of the

respective Classes, and 2) Plaintiffs and their counsel will prosecute the action vigorously, as

they have to date.  More specifically, the Plaintiffs have the same interests that the proposed

Classes they seek to represent have in the relief requested and as discussed below in undersigned

counsel's declarations, counsel have the necessary training, experience and resources to

competently represent the proposed Class, as discussed below in the context of Rule 23(g).  *See*

Gottesdiener Decl. ¶¶ 2-3; Declaration of William H. Blessing ("Blessing Decl.") ¶¶ 2-7.

### B.     The Proposed Classes Satisfy Rule 23(b)(1)(A), (b)(1)(B) and/or (b)(2)

A proposed class that meets the four requirements of Rule 23(a) should be approved if it

complies with any of the three provisions of Rule 23(b).  The proposed Classes here can and

should be certified under Rule 23(b)(1)(A), (b)(1)(B) and/or (b)(2).

### 1.     The Requirements of Rule 23(b)(1)(A) Are Met.

Rule 23(b)(1)(A) certification is appropriate when multiple suits would create a risk of

"inconsistent or varying adjudications with respect to individual members of the class which

would establish incompatible standards of conduct for the party opposing the class."  Rule

23(b)(1)(A) comes into play when a party is obligated by law to treat the members of a class in a

like manner.  *Amchem*, 521 U.S. at 614.  It is precisely for this reason, that "[p]erhaps unique to

ERISA class actions," the requirements of Rule 23(b)(A)(1) are more often met in ERISA than in

any other kind of case – because "[u]nder ERISA, the plan and its fiduciaries generally owe the

same duty to all participants, and a violation of ERISA with respect to one may establish a

violation with respect to all other similarly situated participants."  Gary L. Sasso, *Defense of*

*Federal Class Actions,* 710 PLI/Lit 149, * 250 (July 2004).  *Accord Richards v. FleetBoston Financial Corp.,* 04-cv-1638 (JCH), 2006 WL 2979373, *8-9 (D. Conn. Oct. 16, 2006) (statutory obligation to treat all class members alike in an ERISA plan and the number of affected class members made challenge to the legality of a pension plan formula "well-suited" to treatment under Rule 23(b)(1)(A); "inconsistent rulings on these claims by different courts could create an untenable situation").

Thus, Rule 23(b)(1)(A) applies here because if two courts were to come to different conclusions about the correct crediting and/or projection rates, Defendants would be bound by conflicting edicts, making it impossible for them to implement any one course of action.  *In re Amsted Indus., Inc. ERISA Litig.*, No. 01-C-2963, 2002 WL 31818964, *2 (N.D. Ill. Dec. 16, 2002) (granting certification under (b)(1)(A) because of risk of inconsistent judgments in case challenging plan amendments eliminating lump sum distribution option and changing retirement requirements); *Esden,*182 F.R.D. at 441 (certifying whipsaw case under Rule 23(b)(1)(A)).[13]

---

[13] *Accord Buus v. WAMU Pension Plan,* 251 F.R.D. 578, 588 (W.D. Wash. 2008) (certifying a cash balance case under Rule 23(b)(1)(A) challenging the validity of notices of future benefit accrual rate reductions issued to participants); *Lyell v. Farmers Grp. Inc. Empl'ees' Pens. Plan*, No. CV 07-1576-PHX-JAT, 2008 WL 5111113, *4 (D. Ariz. Dec. 3, 2008) (certifying defined benefit plan case under Rule 23(b)(1)(A) because "the Plan must treat all Participants the same way" and "otherwise, different courts might require different things of the Farmers Plan"); *Humphrey v. United Way*, No. H-05-0758, 2007 WL 2330933 at *10 (S.D. Tex. Aug. 14, 2007) (same, cash balance plan case challenging validity of plan amendment and interpretation of early retirement provisions); *Richards v. FleetBoston Financial Corp.,* 04-cv-1638 (JCH), 2006 WL 2979373, *8-9 (D. Conn. Oct. 16, 2006) (same, cash balance case challenging legality of various provisions and practices); *In re Amsted Indus., Inc. ERISA Litig.*, No. 01-C-2963, 2002 WL 31818964, *2 (N.D. Ill. Dec. 16, 2002) (same, case challenging legality of amendments eliminating lump sum option); *Clauser v. Newell Rubbermaid, Inc.,* No. Civ. A. 99-5753, 2000 WL 1053395, *6 (E.D. Pa. July 31, 2000) (same, action seeking to enforce distribution of plan assets pursuant to termination provisions); *Kohl v. Ass'n of Trial Lawyers of America,* 183 F.R.D. 475, 485-86 (D. Md. 1998) (same, case challenging legality of provision excluding value of COLA from lump sum); *Becher v. Long Island Lighting Co.,* 164 F.R.D. 144, 153 (E.D.N.Y.1996) (same, action challenging contributory pension plan's forfeiture of participants' service credit resulting from their withdrawal of employee contributions); *Schutte v. Maleski*, No. 93-0961, 1993 WL 218898, *8-9 (E.D. Pa. June 18, 1993) (same, challenging legality and effectiveness of various lump sum-related plan amendments).

## 2. The Requirements of Rule 23(b)(1)(B) Are Met.

Certification is also appropriate here under Rule 23(b)(1)(B) because multiple lawsuits would create the risk that the judgment with respect to some members of the proposed Subclasses would, "as a practical matter, be dispositive of the interests of . . . other members . . . or otherwise impair or impede their ability to protect their interests." *Id.,* Rule 23(b)(1)(B). "For a suit to qualify as a class action under this subdivision, it is not necessary for the nonclass judgment to be technically dispositive of the interests of the other members of the putative class, but it must as a practical matter conclude the interests of those members." *Larionoff v. United States,* 533 F.2d 1167, 1181 n.36 (D.C. Cir. 1976) (*citing* Wright & Miller, *Federal Practice & Procedure*, citation omitted). Quoting the Advisory Committee Notes, the Supreme Court has noted that one such case properly certified under Rule 23(b)(1)(B) is a case that "involve[s] the adjudication of the rights of all participants in a fund in which the participants had common rights" where "the adjudication would determine the operating rules governing the fund for all participants." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 n.14 (1999). In such a case, the *stare decisis* effect of the judgment with respect to the claim of one individual is likely to have a compelling impact on future litigation by persons similarly situated because no real individual issues exist to distinguish the earlier precedent.

That is certainly the case here. As a practical matter, if this case is not certified as a class action, it will dispose of the Class members' interests without them ever having representation in the case because, as the district court said in *Berger* in finding Rule 23(b)(1)(B) satisfied, "the Plan's challenged actions are clearly either legal or illegal as to all members of the class." *Berger v. Nazametz,* Civ. No. 00-584, slip op. at 5 (S.D. Ill. Feb. 7, 2001), *aff'd on other grounds sub nom. Berger v. Xerox,* 338 F.3d 755 (7th Cir. 2003); *Dennis v. Sawbrook Steel Castings Co.,*

27

No. C-1-89-487, 1991 WL 260442 (S.D.Ohio Feb. 13, 1991) (ERISA case; "defendants' challenged actions are clearly either legal or illegal as to all members of the class"). Certification under Rule 23(b)(1)(B) is designed for just such a case and is therefore a proper vehicle for certification.  *See In re Amsted Indus., Inc. ERISA Litig.*, 2002 WL 31818964, *8 (granting certification under (b)(1)(B) "[b]ecause the rights of current employees will necessarily be adjudicated in this action, we find that the class action is the proper device to assure that all parties are fairly represented").  *See also Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir. 1993) (reversing district court and ordering case challenging employer's method of estimating participants' social security offsets in ERISA defined benefit plan certified under Rule 23(b)(1)(B)).[14]

### 3.    The Requirements of Rule 23(b)(2) Are Met.

Rule 23(b)(2) applies where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Cases may be certified under Rule 23(b)(2) if they seek monetary relief or even damages provided the monetary relief sought is "incidental" or "secondary" to predominant claims for declaratory or injunctive relief. *Reeb v. Ohio Dept. Of Rehab. & Corr.,* 435 F.3d 639, 649 (6th Cir.2006).  That is the case here, as is often true in retirement benefits cases.  *See Schumacher v. AK Steel Corp. Ret. Acc. Pension Plan,* No. 1:09-CV-794, Doc. 38 at 1 (S.D. Ohio Nov. 23, 2010) (certifying settlement class in whipsaw case under Rule 23(b)(2)).  Such cases rarely present anything like the kind of obstacles

---

[14] Among the many other pension benefit cases certified under Rule 23(b)(1)(B), *see In re J.P. Morgan Cash Balance Litig.*, 242 F.R.D. 265, 276 (S.D.N.Y. 2007) (cash balance plan case); *Walker v. Monsanto*, 04-cv-436-JPG-PMF, Doc. 276 at 6 (S.D. Ill. May 22, 2008) (cash balance plan case); *Helms v. Local 705 Int'l Bdh. of Teamst. Pens. Plan,* 97 C 4788, 1998 WL 182513, at *2 (N.D.Ill. Apr.16, 1998); *Schutte*, 1993 WL 218898, *9; *Church v. Consolidated Frgt'ways,* No. C-90-2290 DLJ, 1991 WL 284083, *14 (N.D. Cal. 1991).

to Rule 23(b)(2) certification as can exist in many other kinds of cases – such as the gender discrimination case the Supreme Court recently decided, *Wal-Mart Stores, Inc. v. Dukes*, No. 10–277, 2011 WL 2437013 (U.S. June 20, 2011), which did not qualify under Rule 23(b)(2) because it predominantly sought individualized monetary relief, *id.* at *12.  This is true not only because compensatory and punitive damages are not even available under ERISA, *see Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134 (1985), but first and foremost because in cases like the instant case, the monetary relief sought would flow directly and indeed "mechanically" from liability to the class as a whole.  *Berger*, 338 F.3d at 764 (holding (b)(2) certification of whipsaw case proper for that reason even when relief characterized as "damages").  Once the correct crediting and projection rates are determined, the calculations are mechanistic as illustrated by whipsaw decisions ordering complete relief on summary judgment like this Court's decision in *West v. AK Steel*, 02-CV-0001, 2005 WL 3465637 (S.D.Ohio Dec. 19, 2005).  *Accord Berger v. Xerox Corp. Ret. Income Guar. Plan*, 231 F.Supp.2d 804 (S.D. Ill. 2002).

In other words, this case would satisfy even the Fifth Circuit's exacting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir.1998) test, which *Dukes* indicates would have to be satisfied in a monetary relief case, *Dukes,* 2011 WL 2737013, at *15, because the different amounts participants will be due will be determined solely by reference to standardized actuarial computations based on a common methodology applied to the same undisputed, objective participant data the Plan has always used to calculate benefits – no individualized damages determinations of disparate claims would be involved.  That is why, both before and since *Berger,* numerous other courts, including this Court, *see Schumacher, infra,* have correctly approved the certification of classes under Rule 23(b)(2) in suits by pension plan participants seeking declaratory and injunctive relief and a corresponding increase in their pension benefits,

*i.e.,* "monetary relief." *E.g., Kifafi v. Hilton,* 189 F.R.D. 174, 177 (D.D.C.1999) ("[t]he method used to calculate the rate of benefit-accrual is a practice applicable across the board to all class members, 'thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole'").[15]

### C.     The Court Should Appoint Undersigned Counsel as Class Counsel Under Rule 23(g).

Under Rule 23(c)(1)(B) and Rule 23(g), a court certifying a class must appoint class counsel based on a consideration of a variety of common sense factors.  Fed. R. Civ. P. 23(c)(1)(B), 23(g).  The Court should find that Plaintiffs' counsel have considerable experience in both ERISA and class actions, are qualified to represent the proposed class; and can be expected to perform their responsibilities adequately in light of that experience, the record to date in this case, and related considerations.

Eli Gottesdiener has practiced law for over 25 years, the great majority of it spent litigating complex federal civil matters, with the past 12 years devoted almost exclusively to the representation of current and former participants in ERISA-governed pension plans.  Gottesdiener Decl.  ¶¶ 2-3.  He has been appointed as class counsel in the following ERISA pension benefit class actions:

- A pension benefits and 401(k) case involving, among other things, a $3 billion transfer of 401(k) plan assets to a pension plan, pursuant to which the participants were stripped of their right to the gains earned through the investment of their 401(k) accounts.  *Pender v.*

---

[15] *Accord Shields v. Local 705,* No. 96 C 1928, 1996 WL 616548, *5-7 (N.D. Ill. Oct. 23, 1996) (Rule 23(b)(2) certification granted; pension participants primarily sought determination regarding the crediting of service for purposes of benefit calculations even though they also sought an order directing the plan to make any payments still due); *Diehl v. Twin Disc., Inc.,* No. 94 C 50031, 1995 WL 330637, *6 (N.D. Ill. May 30, 1995); *LaFlamme v. Carpenters Local #370 Pension Plan,* 212 F.R.D. 448, 456 (N.D.N.Y. 2003); *Richards v. FleetBoston Financial Corp.,* 235 F.R.D. 165, 174 (D. Conn. 2006)  ("For purposes of subsection (b)(2), an injunction requiring the payment of monies unlawfully withheld in the past may be considered injunctive relief," *citing Walsh v. Northrop Grumman Corp.,* 162 F.R.D. 440 (E.D.N.Y.1995)).

*Bank of America Corp.*, 269 F.R.D. 589 (W.D.N.C. 2010) (lead counsel; case filed in 2004, still pending).[16]

- A cash balance "whipsaw" case involving two plans with an equity-based interest crediting rate somewhat similar to the crediting rate at issue here.  *Thompson v. Retirement Plan for Employees of S.C. Johnson & Sons, Inc.*, 265 F.R.D. 405 (E.D. Wis. 2010) (lead counsel; case filed in 2007, still pending).[17]

- Another whipsaw case involving a plan substantially similar to those involved in *Thompson.  Ruppert v. Alliant Energy Cash Balance Pension Plan*, 255 F.R.D. 628 (W.D. Wis. 2009) (lead counsel; case filed in 2008, still pending).[18]

- A whipsaw case involving a complex age-weighted interest crediting rate designed to exactly replicate, in cash balance form, the traditional formula under the plan.  *Traylor v. Avnet, et al.*, No. 08-cv-00918-PHX (FJM) (D. Ariz.) (lead counsel; settled for $34 million, 2010).

- A whipsaw case involving a variable interest crediting rate with a complicated lesser-of minimum based on a fixed rate and the mid-range of rates set by regulation.  *Flagg v. Skadden, Arps, Slate, Meagher & Flom Pension Plan,* No. 07 Civ. 7392 (S.D.N.Y.) (PKC) (lead counsel; $12.4 million settlement, 2009).

- A fiduciary breach case involving the defined benefit and defined contribution plans sponsored New York Life Insurance Co. on behalf of employees and agents.  *Mehling v. New York Life Ins. Co.*, Civ. No. 99-CV-5417 (E.D. Pa.) (co-lead counsel; $14 million settlement, 2008).

- A pension benefit case pending against the AT&T Pension Benefit Plan in the District Court for the District of Columbia, *Wagener v. SBC Pension Benefit Plan-Nonbargained Program*, Civ. No. 03-769 (RCL) (D.D.C.) (co-lead counsel; $16 million settlement, 2008).

---

[16] Counsel notes that while this case is still pending, several years after it was filed in 2004, the Bank disclosed in SEC filings that the IRS conducted an audit and agreed with plaintiffs that the transfer violated ERISA and the Internal Revenue Code's "anti-cutback" rule.  *See Pender v. Bank of America Corp.*, 756 F.Supp.2d 694 (W.D.N.C. 2010).

[17] As noted above, the Seventh Circuit recently ruled in favor of two of the four subclasses in this case on the statute of limitations and damages, *Thompson v. Retirement Plan for Employees of S.C. Johnson & Son, Inc.,* Nos. 10–3917-18, 3988-89, 2011 WL 2463550 (7th Cir. June 22, 2011) (also finding some participants time-barred on the same basis this Court did, *i.e.,* that the applicable limitations period commenced when participants received their lump sums).

[18] After trial, the district court, replying in substantial part on Plaintiffs' financial economics expert's stochastic modeling, held that future interest credits should have been projected at the rate of 8.2%. *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 08-cv-127-bbc, 2010 WL 5464196 (W.D.Wis. Dec. 29, 2010).

31

- A fiduciary breach case involving Enron Corp.'s 401(k), ESOP and cash balance pension plans. *Tittle, et al. v. Enron Corp., et al.*, H-01-3913 (S.D. Tex.) (liaison class counsel; settled in phases between 2003-06 for an amount exceeding $225 million).

- A fiduciary breach case with respect to the investment of defined benefit plan assets. *Bell v. UFCW*, Civ. No. 01-236 (ESH) (D.D.C.) (co-lead counsel; settled for $10 million, 2003).

- A 401(k) fiduciary breach class action. *Gottlieb v. SBC Communications, Inc.*, CV-00-4139 AHM (C.D. Calif.) (co-lead counsel; settled for $10 million, 2002).

Gottesdiener Decl. ¶ 3.

Plaintiffs are also represented by William Blessing, a practitioner with 35 years experience who has concentrated on employee benefits, consumer and commercial rights litigation, with a mix of class action cases and individual ERISA cases for the past 20 years. *See* Blessing Decl. ¶¶ 2-7.

Counsel respectfully submit that they are qualified to be appointed as Class Counsel pursuant to Rule 23(g).

## III.    The Proposed Notice Satisfies Rule 23

Assuming the Court preliminarily determines that the Settlement is within the range of possible approval, conditionally certifies the Class, and appoints Plaintiffs' counsel as Class Counsel, it must then address the notice to be given to the Class.

Rule 23(e) requires that the district court "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).  Rule 23(e) notice is designed "to summarize the litigation and the settlement and to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *In re Prudential Ins. Co.,* 148 F.3d 283, 327 (3d Cir.1998).  Notice to the putative class members is essential to providing each member with due process because

32

members of the settlement classes will be bound to the resolution of this case. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313-14 (1950).

Here, the proposed mailed and publication Notice, in terms of both their content and their manner of dissemination, satisfy the requirements of Rule 23(e) and due process.

### A. The Content of the Proposed Notice Satisfies Rule 23

The content of the Mailed and Publication Notice provide all of the required information concerning Class Members' rights and obligations under the proposed settlement. The Notice sets forth the background of the litigation, the definition of the Class and the key terms of the Settlement. It contains sufficient detail to permit each member of the proposed Settlement to make an informed decision about whether to support or oppose Settlement as well as how to obtain additional information about the Settlement, whether through the website dedicated to the lawsuit or by contacting Class Counsel directly. *See In re Gen. Tire & Rubber Co. Sec. Litig.,* 726 F.2d 1075, 1086 (6th Cir.1984) (upholding notice that "described the terms of the settlement, the reasons for [class representatives' decision to settle], the legal effect of the settlement and the rights of the [class members] to voice their objections"). It details the procedures for filing objections to the Settlement, Class Counsel's fee petition and/or the request for an award of special payments to the two Named Plaintiffs and for requesting to be heard at the final approval hearing. It explains how to make the elective choice between a rollover and a direct payment via easy-to-understand enclosed forms and instructions. The Mailed Notice arguably goes beyond the requirements of the Rule by providing a specific estimate of each Class Member's Settlement Benefit.

**B.      The Method of Disseminating Notice to Class Members Satisfies Rule 23**

The method of transmitting the Notice also satisfies Rule 23.  Upon preliminary approval of the Settlement, Defendants will transmit the last known address of all Class Members to the Notice Administrator which will confirm or update the valid postal addresses for the Class members and cause the Notices to be mailed by first class mail to each identified member of the Class.  *See* Ex. 1 at 11, § 3A.  In the event that the Postal Service returns any of the Notices as undeliverable, the Notice Administrator will take further steps to obtain correct addresses and re-mail the Notice to those recipients.  *Id.* at 12 § 3C.  Dissemination of the mailed Notice by first class mail is the usual notification method for class action certifications and settlements.  *See In re Prudential Ins.,* 148 F.3d at 326-28 (opt-out class requiring claims); *In re IKON Office Solutions, Inc*., 209 F.R.D. 94, 101 (E.D. Pa. 2002) (non-opt out class, published notice program also used).

Under the circumstances, Plaintiffs believe that it is sufficient to make only one publication of the Published Notice in a national newspaper.  Plaintiffs' counsel believe that the Plan's last known address information coupled with the Notice Administrator's address update efforts will assure the best practicable communication with the Settlement Class members.  Where, as here, Class counsel is reasonably certain that the address information available from the Defendants is comprehensive and will be updated as necessary by the Notice Administrator, and where the parties have already agreed to provide individualized notice via first class mail, which is the preferred method for disseminating class notice, the extra expense of multiple publications of published notice is not warranted.

## CONCLUSION

WHEREFORE, for the reasons stated and such other reasons as may appear to the Court, Plaintiffs respectfully request that the Court grant preliminary approval of the Settlement, conditionally certify the proposed Class, appoint Plaintiffs' counsel as Class Counsel, and enter the proposed Order attached hereto, authorize mailed and published notice to the Class, and schedule the hearing on final approval of the Settlement.

Dated:  July 5, 2011

Respectfully submitted,

/s/William H. Blessing
William H. Blessing (#0006848)
The Blessing Law Firm
119 East Court Street, Suite 500
Cincinnati, Ohio 45202
Telephone:  (513) 621-9191
Telecopier:  (513) 621-7086

Eli Gottesdiener (admitted *PHV*)
Gottesdiener Law Firm, PLLC
498 7th Street
Brooklyn, New York 11215
Telephone:  (718) 788-1500
Telecopier:  (718) 788-1650

*Counsel for Plaintiffs and the proposed Class*

## CERTIFICATE OF SERVICE

I certify that I caused a copy of this document to be electronically filed with the Clerk of Court on this 5th day of July 2011 using the CM/ECF system, which will send notification of the filing to:

Jeremy P. Blumenfeld
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-5000
Fax: (215) 963-5001

Charles C. Jackson
James E. Bayles, Jr.
Gregory P. Abrams
Stephanie M. Christiansen-LaRocco
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, Illinois 60601
Telephone: (312) 324-1000
Fax: (312) 324-1001

Michael D. Eagen
DINSMORE & SHOHL LLP
255 East Fifth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: (513) 977-8578
Facsimile:  (513) 977-8141

Reagan M. Brown
FULBRIGHT & JAWORSKI L.L.P.
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5100
Facsimile: (713) 651-5246

Barry W. Cowan
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

*/s/Eli Gottesdiener*